UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DEBRA D.,[1]<br><br>          Plaintiff,<br><br>     vs.<br><br>NANCY A. BERRYHILL, Acting Commissioner, Social Security Administration,<br><br>          Defendant. | CIV. 17-5027-JLV<br><br>ORDER |

## INTRODUCTION

Plaintiff Debra D. filed a complaint appealing the final decision of Nancy A. Berryhill, the Acting Secretary of the Social Security Administration, finding her not disabled. (Docket 1). The Commissioner denies plaintiff is entitled to benefits. (Docket 6). The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF"). (Docket 8). The parties filed their JSMF. (Docket 11). For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner is granted.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 11) is incorporated by reference. Further recitation of salient facts is incorporated in the discussion section of this order.

---

[1]The Administrative Office of the Judiciary suggested the court be more mindful of protecting from public access the private information in Social Security opinions and orders. For that reason, the Western Division of the District of South Dakota will use the first name and last initial of every non-governmental person mentioned in the opinion. This includes the names of non-governmental parties appearing in case captions.

On February 10, 2014, plaintiff Debra D. filed an application for disability insurance benefits ("DIB"). Id. ¶ 1. She was insured for DIB coverage purposes through December 30, 2019. Id. She alleged an onset of disability date of January 1, 2014. Id. On April 6, 2016, an administrative law judge ("ALJ") issued a decision finding Debra D. was not disabled. Id. ¶ 4; see also Administrative Record at pp. 12-26 (hereinafter "AR at p. ____"). The Appeals Council denied Debra D.'s request for review and affirmed the ALJ's decision. (Docket 11 ¶ 13). The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration. It is from this decision which Debra D. timely appeals.

The issue before the court is whether the ALJ's decision of April 6, 2016, that Debra D. "has not been under a disability within the meaning of the Social Security Act from January 1, 2014, through [April 6, 2016]" is supported by substantial evidence in the record as a whole. (AR at p. 12); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580. The court reviews the Commissioner's decision to determine if an error of law was

committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992).
"Substantial evidence is less than a preponderance, but is enough that a
reasonable mind would find it adequate to support the Commissioner's
conclusion." <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006) (internal
citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of
the record for the existence of substantial evidence in support of the
Commissioner's decision . . . [the court must also] take into account whatever
in the record fairly detracts from that decision." <u>Reed v. Barnhart</u>, 399 F.3d
917, 920 (8th Cir. 2005) (quoting <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th
Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this
court would decide the case differently, it cannot reverse the Commissioner's
decision if that decision is supported by good reason and is based on
substantial evidence. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir.
2005). A reviewing court may not reverse the Commissioner's decision
" 'merely because substantial evidence would have supported an opposite
decision.' " <u>Reed</u>, 399 F.3d at 920 (quoting <u>Shannon v. Chater</u>, 54 F.3d 484,
486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given
to the Commissioner's construction of the Social Security Act. <u>See</u> <u>Smith</u>,
982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to DIB under Title II. 20 CFR § 404.1520(a). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id. The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment— one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations. (AR at pp. 25-26).

**STEP ONE**

At step one, the ALJ determined plaintiff had "not [been] engaged in substantial gainful activity since January 1, 2014, the alleged onset date." (AR at p. 14).

**STEP TWO**

At step two, the ALJ must decide whether the claimant has a medically determinable impairment that is severe or a combination of impairments that

are severe.   20 CFR § 404.1520(c).   A medically determinable impairment can only be established by an acceptable medical source.   20 CFR § 404.1513(a). Accepted medical sources include, among others, licensed physicians.   Id.   "It is the claimant's burden to establish that [her] impairment or combination of impairments are severe."   Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).

The regulations describe "severe impairment" in the negative.   "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 CFR § 404.1521(a).   An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   Kirby, 500 F.3d at 707. Thus, a severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities.

The ALJ identified Debra D. suffered from the following severe impairment: "Short-bowel syndrome, degenerative joint disease of the knees, [and] repeated meniscal derangement status post arthroscopic partial medial meniscectomies."   (Docket 11 ¶ 6).   Plaintiff does not challenge this finding. (Dockets 14 & 19).

### **STEP THREE**

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1").

20 CFR §§ 404.1520(d), 404.1525, and 404.1526.   If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled.   At that point the Commissioner "acknowledges [the impairment or combination of impairments] are so severe as to preclude substantial gainful activity. . . . [and] the claimant is conclusively presumed to be disabled." Bowen v. Yuckert, 482 U.S. 137, 141 (1987).   A claimant has the burden of proving an impairment or combination of impairments meet or equals a listing within Appendix 1. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).   If not covered by these criteria, the analysis is not over, and the ALJ proceeds to the next step.

At this step the ALJ determined plaintiff's severe impairments did not meet or equal a listing under Appendix 1.   (Docket 11 ¶ 9).   Plaintiff does not challenge this finding.   (Dockets 14 & 19).

## **STEP FOUR**

Before considering step four of the evaluation process, the ALJ is required to determine a claimant's residual functional capacity ("RFC"). 20 CFR § 404.1520(e).   RFC is a claimant's ability to do physical and mental work activities on a sustained basis despite any limitations from her impairments.   20 CFR §§ 404.1545(a)(1).   In making this finding, the ALJ must consider all the claimant's impairments, including those which are not severe.   20 CFR § 404.1545(e).   All the relevant medical and non-medical

evidence in the record must be considered.   20 CFR §§ 404.1520(e) and 404.1545.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations."   Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)); see also Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (because RFC is a medical question, the ALJ's decision must be supported by some medical evidence of a claimant's ability to function in the workplace, but the ALJ may consider non-medical evidence as well); Guilliams, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's finding must be supported by some medical evidence.").   The ALJ "still 'bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.' "   Id. (citing Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000)).

"In determining RFC, the ALJ must consider the effects of the combination of both physical and mental impairments."   Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004) (citing Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)).   As stated earlier in this discussion, a severe impairment is one which significantly limits an individual's physical or mental ability to do basic work activities.   20 CFR § 404.1521(a).

Relevant to this appeal, the ALJ determined Debra D. retained the RFC to perform "light work."[2] (Docket 11 ¶ 10). Plaintiff challenges this finding. (Docket 14). She argues "[t]he ALJ's RFC does not include Plaintiff's need to take extra breaks to use the bathroom and does not recognize her need to reduce stress and her expected absences due to necessary emergency room visits and hospitalizations." Id. at p. 21. Plaintiff contends these special circumstances "are supported by the overwhelming consistent evidence from her doctors, her testimony and third party observations." Id. Second, Debra D. argues the RFC is not valid because the "ALJ's credibility determination is not supported by substantial evidence." Id. (capitalization and bold omitted). The court addresses these challenges in reverse order.

1.    IS THE ALJ'S CREDIBILITY DETERMINATION
      SUPPORTED BY THE SUBSTANTIAL EVIDENCE?

Addressing Debra D.'s credibility, the ALJ found:

[T]he claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the evidence for the reasons explained in this decision. Here, the claimant has described daily activities and exhibited behavior that is inconsistent with the claimant's allegations of disabling symptoms and limitations. Additionally,

_____

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b).

the objective medical records do not completely corroborate her statements and allegations regarding her impairments and resultant limitations.

(AR at pp. 17-18).   Stated another way, the ALJ found:

> [Debra D.'s] impairments could be reasonably expected to cause physical symptoms described above, such as abdominal pain, tenderness, and discomfort [and] chronic diarrhea . . . . However, the intensity, persistence and limiting effects of these symptoms, as shown in claimant's reported of [sic] daily activities, indicate a greater functionality than alleged.   The claimant testified that she was working part-time, crocheted, read, watched television, and helped care for her daughter.   Despite the claimant's symptoms, the claimant reported that she worked regularly, helped run errands, had few problems maintaining personal care, did not need special reminders to take medication, prepared simple meals, did laundry, washed dishes, ironed clothes, could go out alone, drove a car, shopped in stores, talked with friends on the computer, went to church, and had no problems following instructions . . . . Moreover, the objective medical records indicate that the claimant showed no acute distress . . . and non-distended abdomen, and intact bowel sounds.

(AR at pp. 21-22).

Plaintiff argues "[t]he ALJ's credibility analysis ignores the very essence of Plaintiff's disability."   (Docket 14 at p. 24).   Debra D. contends "[s]he made heroic efforts to remaining working despite her severe medical impairments. The ALJ's analysis of [her] credibility provides little to no support for the finding that she can perform full-time competitive work."   Id.   As part of her credibility challenge, plaintiff argues the ALJ failed to give proper consideration to the third-party statements, the opinions of her medical care providers and her two therapists.   Id. at pp. 25-27.

Principal to plaintiff's credibility challenge is the fact that she suffers from severe short bowel syndrome. See AR at p. 14. The syndrome is generally defined as follows:

> Short bowel syndrome is a group of problems related to poor absorption of nutrients. . . . Short bowel syndrome usually occurs in those who have had at least half of their small intestine removed and sometimes all or part of their large intestine removed; significant damage of the small intestine; and/or poor motility, or movement, inside the intestines. . . . Short bowel syndrome may be mild, moderate, or severe, depending on how well the small intestine is working.

(Docket 11 ¶ 7).

While the ALJ addressed many of Debra D.'s medical encounters, the ALJ did not acknowledge all of them and entirely failed to mention the course of treatments provided, including the administration of prescription drugs. Because Debra D. claimed her onset of disability date at January 1, 2014, the ALJ did not consider any of her 2013 medical records. The court finds those records are critical to the analysis of Debra D.'s credibility because those historic records set up a major change in her condition beginning in 2014. For clarity of the analysis of the ALJ's decision, the court will place in bold print the dates of medical care in 2014 and 2015 and prescription drugs not mentioned by the ALJ. The court also includes Debra D.'s sessions with her two therapists in this chronology as they will be discussed later in this order.

<u>2004-2012</u>

Following a laparoscopic cholecystectomy, Debra D. experienced complications and in 2004 required surgery involving the removal of five and one-half feet of her small intestine and her entire colon.   <u>Id.</u> ¶¶ 21 & 29.   Over the course of the next several years, Debra D. encountered difficulties with her condition.   <u>Id.</u> ¶ 29.   Her medical records note that she suffered abdominal pain and chronic diarrhea.   (AR at pp. 704, 707, 710, 714, 717, 727).   These conditions were generally treated and controlled with prescription medication.   <u>Id.</u> at pp. 707, 711-12, 715-20, 722-28, 732, 741 and 746.   A treating medical provider charted that she suffered episodes of fecal incontinence, both during the day at work and at night.   <u>Id.</u> at pp. 710.   Her associated depression was treated with **Cymbalta**[3] and **Wellbutrin**,[4] which failed from time-to-time to relieve her condition.   <u>Id.</u> at pp. 714, 716-17, 723 and 729.   She was in psychotherapy with Dr. Stephan M., a Rapid City, South Dakota, psychiatrist, and his clinical staff.   (Docket 11 ¶ 158).   In February 2006, Loyal T., M.D., Ph.D., recommended Debra D. discuss her stress and coping issues with Dr.

---

[3]"Cymbalta (duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor antidepressant (SSNRI).   Duloxetine affects chemicals in the brain that may be unbalanced in people with depression.   Cymbalta is used to treat major depressive disorder in adults.   It is also used to treat general anxiety disorder in adults . . . ."   <u>https://www.drugs.com/cymbalta.html</u>.

[4]"Wellbutrin (bupropion) is an antidepressant medication used to treat major depressive disorder and seasonal affective disorder." https://www.drugs.com/wellbutrin.html.

Stephan M.   (AR at p. 720).   Dr. Loyal T. agreed to write plaintiff's work

supervisor to encourage stress reduction measures at work.   Id.

2013

On May 11, 2013, Debra D. was admitted to the Rapid City Regional

Hospital through the emergency room because of a sudden onset of abdominal

pain which developed while she was at work driving a trolley in Deadwood,

South Dakota.   (Docket 11 ¶ 30; see also AR at p. 422).   A CT scan disclosed

a small bowel anastomosis[5] and questionable partial obstruction and a

significant amount of liquid stool throughout the length of her colon.   (Docket

11 ¶ 30).   She remained in the hospital for three days.   Id.

Eleven days later, on May 25, 2013, Debra D. was seen at the Rapid City

Regional Hospital emergency room complaining of diffuse abdominal pain with

bloating and chronic diarrhea.   Id. ¶ 31.   On examination, the physician

charted her abdomen as "diffuse, soft and tender."   (AR at p. 441).   Her

discharge assessment that night was "abdominal pain."   Id. at p. 443.

At about 1:30 a.m. on October 21, 2013, Debra D. went to the Rapid City

Regional Hospital emergency room with complaints of diffuse abdominal pain

and nausea.   (Docket 11 ¶ 32; see also 453).   A abdominal CT scan disclosed

---

[5]"An anastomosis is a surgical connection between two structures. . . .
For example, when part of an intestine is surgically removed, the two
remaining ends are sewn or stapled together (anastomosed).   The procedure is
known as an intestinal anastomosis."
https://medlineplus.gov/ency/article/002231.htm.

no evidence of any obstruction, but she had distention of the right and transverse colon with fluid and air.   (Docket 11 ¶ 32).   The discharge impression was charted as diffuse abdominal pain and proximal colonic distention without signs of bowel obstruction.   Id.

That day Debra D. began a relationship with Catholic Social Services ("CSS") for counseling to help deal with her chronic medical problems. (Docket 11 ¶ 60).   Her intake evaluation was performed by Holly T.[6]   Id. ¶ 61. Among other presenting concerns, Debra D. reported experiencing persistent anxiety, constant fatigue, some difficulty concentrating, some irritability, insomnia and stomach pain.   Id.   She described sleeping six to seven hours a night, but waking up three to four times a night resulting in constant fatigue. Id.   Debra D. was working a five-day a week job and a second, two-day a week job.   Id.   The mental status examination charted by Holly T. noted Debra D. presented with unremarkable appearance and behaviors, normal thoughts and thought content, normal cognition and perceptions.   Id.   Holly T.'s clinical impression was depression due to short bowel syndrome.   Id.   The therapist recommended Debra D. participate in further counseling to address her issues. Id.

---

[6]Holly T. has a Masters in Social Work ("MSW"), is a Certified Social Worker ("CSW"), a Clinical Depression Certified Therapist ("CDCT") and a licensed Qualified Mental Health Professional ("QMHP").   (Docket 11 ¶ 61).

On November 18, 2013, Debra D. had an annual physical at Regional Health Physicians.  Id. ¶ 33.  Certified Nurse Practitioner ("CNP") Rhonda E. charted Debra D.'s mood as anxious and depressed.  Id.  While the remainder of the examination was normal, CNP Rhonda E. charted short bowel syndrome and depressive disorder.  Id.

Debra D. saw Holly T. on December 17, 2013.  Id. ¶ 62.  Debra D. reported experiencing a bad episode, not otherwise detailed, while shopping with her daughter, which required her to go home.  Id.  Debra D. indicated waking up several times a night and being unable to get back asleep right away.  Id.  The therapist's notes indicated Debra D. was going to try to reduce her stress by walking regularly and would be decreasing her work hours at the Northern Hills Training Center on January 1, 2014.  Id.  Holly T. suggested decreasing her number of work hours to help decrease her stress level.  Id.

On the evening of December 18, 2013, Debra D. went to the Sturgis Regional Hospital emergency room with complaints of vomiting and diarrhea.  Id. ¶ 34; see also AR at p. 388.  She reported passing gas and feeling like she may have a bowel obstruction.  (Docket 11 ¶ 34).  Blood testing disclosed

her potassium was low[7] and her ALK PHOS[8] was high.   Id.   The discharge

assessment that night was gastroenteritis.   Id.

2014

On January 14, 2014, Debra D. saw Dr. Gary D. because of abdominal

pain which started on December 17, 2013.   Id. ¶ 35.   An abdominal x-ray

disclosed distal colonic constipation with air fluid levels in the right colon.   Id.

A physical examination charted Debra D.'s abdomen as mildly distended, with

both left and right lower quadrant tenderness.   Id.   Her chart recorded that

she was anxious.   Id.   The doctor charted that she was taking **Perphenazine-**

---

[7]"Low potassium (hypokalemia) has many causes.   The most common
cause is excessive potassium loss in urine due to prescription medications that
increase urination. . . . Vomiting, diarrhea or both also can result in excessive
potassium loss from the digestive tract.   Occasionally, low potassium is
caused by not getting enough potassium in your diet."   (Docket 11 at p. 11
n.1).

[8]"ALK PHOS (An Alkaline Phosphatase (ALP) test measures the amount of
the enzyme ALP in the blood.   A test for alkaline phosphatase (ALP) is done to:
check for liver disease or damage to the liver.   Symptoms of liver disease can
include jaundice, belly pain, nausea, and vomiting; check bone problems
(sometimes found on X-rays), such as rickets, bone tumors, Paget's disease, or
too much of the hormone that controls bone growth (parathyroid hormone)."
(Docket 11 at p. 11 n.2).

**Amitriptyline**[9] and **Wellbutrin**.  (AR at p. 402).   Dr. Gary D. prescribed

**Bentyl**[10] and **Perphenazine-Amitriptyline**.   Id. at p. 403.

On January 28, 2014, Debra D. met with Holly T.   Id. ¶ 63.   Debra D. reported that reducing her work hours decreased some of her stress.   Id.   The mental status examination charted by Holly T. showed Debra D. had normal mood, thought, behavior, speech, affect, appearance and no suicidal ideation. Id.

On February 2, 2014, Debra D. returned to the emergency room at Rapid City Regional Hospital with worsening severe diffuse abdominal pain and intractable watery diarrhea.   Id. ¶ 36.   Her ALK PHOS was charted as high. Id.   The physical examination noted moderately diffuse abdominal tenderness. Id.   Her condition was treated with **Morphine**, IV fluids and she was released in stable condition.   Id.; see also AR at p. 465.   The discharge assessment was abdominal pain with resolved pain.   (Docket 11 ¶ 36; see also AR at p. 462).

---

[9]Perphenazine-Amitriptyline are antidepressants which "affect chemicals in the brain that may be unbalanced in people with depression or mental illness.   Amitriptyline and perphenazine is a combination medicine used to treat depression, anxiety, and agitation." https://www.drugs.com/mtm/amitriptyline-and-perphenazine.html.

[10]Bentyl (dicyclomine) "is used to treat a certain type of intestinal problem called irritable bowel syndrome.   It helps to reduce the symptoms of stomach and intestinal cramping.   This medication works by slowing the natural movements of the gut and by relaxing the muscles in the stomach and intestines."   https://www.webmd.com/drugs/2/drug-5245/bentyl-oral/details.

On March 13, 2014, Debra D. had a session with Holly T.   Id. ¶ 64.

Debra D. reported suicidal ideation, but she did not want to leave her family

and friends.   Id.   She indicated being off work because of flu issues, but she

was planning to return to work the next week.   Id.   Holly T. charted that she

would look for an appropriate support group for Debra D.   Id.

On March 18, 2014, Debra D. went to see Holly T.   Id. ¶ 65.   Present

during that counselling session were four other counselors and Dr. Stephen M.

Id.   Debra D.'s presenting issue was depression.   Id.   While not suicidal,

Debra D. was tired of living the way she was.   Id.   She reported not sleeping

well, waking up frequently, being constantly tired, her appetite was okay, but

she was experiencing stomach cramps constantly.   Id.   Debra D. further

reported she did not find pleasure in activities and was worried all the time.

Id.   The clinical diagnosis was depression disorder due to short bowel

syndrome with depressive features.   Id.   Debra D. was encouraged to

"maintain [a] relationship with [her] gastroanologist [sic]."   (AR at p. 531).

Debra D. met with Holly T. on April 8, 2014.   Id. ¶ 67.   Debra D.

reported she had just taken a trip to Arizona.   Id.   During the trip, she slept

well one night, but the other nights she was afraid of having incontinent

accidents.   Id.   Even with reduced work hours, Debra D. indicated she

continued to struggle.   Id.   Holly T. recommended a website which has

information about people with short bowel syndrome.   (AR at p. 529).   That

same day, on CSS's stationary, Holly T. wrote a "To Whom It May Concern"

letter.  Id. ¶ 66; see also AR at p. 484.  After summarizing Debra D.'s therapy record, Holly T. stated:

> It is of my professional opinion that Debra's diagnosis of Short Bowel syndrome has had a great impact on her personal life, preventing her from being able to do the things she likes to do, and her capability to work where she has had to decrease a number of hours that she is able to work because of being ill.

Id.

On April 17, 2014, Debra D. saw CNP Rhonda E. at Regional Health Physicians.  Id. ¶ 37.  Her complaints included sluggishness, fatigue, decreased appetite, shortness of breath, continuing watery diarrhea and short bowel syndrome.  Id.  Debra D. reported this current episode started after she ate nachos.  Id.  She was given a note to limit her work to two days per week on a permanent basis due to chronic illness.  Id.  The note included the following explanation: "due to her Short Bowel Syndrome she continues to have bouts of diarrhea that make it hard to perform her duties at work."  Id.

On June 17, 2015, Debra D. saw Holly T.  Id. ¶ 68.  Debra D. reported she had been denied disability.  Id.  She was stressed and reported making a couple of mistakes at work, which upset her more.  Id.  Debra D. was very anxious and stated she did not know if she could continue living the way she was.  Id.  She was scheduled to see a new doctor on July 17 and was hoping he would be responsive to her needs.  Id.

On June 24, 2014, Debra D. met with Holly T.  Id. ¶ 69.  She was charted as being depressed and worried.  Id.  Debra D. reported being unable

18

to eat at work because of her concern that she would have to go to the bathroom many times. Id. Holly T. discussed how stress plays a part of physical health, recommended Debra D. cut back on work hours, and referred her to a psychiatrist at Behavior Management Systems. Id.

On **June 25, 2014**, Debra D. reported to the Sturgis Regional Hospital emergency room with complaints of abdominal pain. Id. ¶ 38; see also AR at p. 609. Her chart noted she was visibly crying and had "moderate . . . distress." (AR at pp. 611 & 614). The attending physician ordered IV fluids. Id. at p. 612. Debra D. was encouraged to see her regular physician as a follow-up of her current condition and she was discharged with **Prilosec**.[11] Id. at p. 615.

Debra D. established a new patient relationship with Dr. Richard K. of Regional Health Physicians on July 17, 2014. (Docket 11 ¶ 39). The chart noted Debra D.'s prior care with Dr. Loyal T. and CNP Rhonda E. of the same clinic. (AR at p. 510). Dr. Richard K.'s examination charted a normal abdomen with normal bowel sounds. (Docket 11 ¶ 39). His assessment was short bowel syndrome for which he prescribed **Bentyl**. (AR at p. 513). Dr. Richard K. charted that Debra D. had chronic problems for which he had no solution. (Docket 11 ¶ 39). He recommended she use **Bentyl** more regularly

---

[11]"Prilosec (omeprazole) is a proton pump inhibitor that decreases the amount of acid produced in the stomach." https://www.drugs.com/prilosec.html.

and if it was not providing relief, he would recommend putting her on a low dose of **Hydrocodone**.  Id.  He also prescribed **Perphenazine-Amitriptyline**. (AR at p. 513).

That same day, Debra D. met with Holly T.  Id. ¶ 70.  Her chart indicates she was agitated, speech pressured and she had not been sleeping well.  Id.  They discussed the role stress played in her work and Holly T. suggested Debra D. keep a journal of activities during the day to see if there was a pattern.  Id.  She was encouraged to take care of her health and personal wellbeing first.  Id.

Five days later, on July 22, 2014, Debra D. was seen at the Rapid City Regional Hospital emergency room.  Id. ¶ 40; see also AR at pp. 492-98. Upon admission, she reported chronic diarrhea with chronic abdominal pain for which prescription medication had not worked.  (Docket 11 ¶ 40).  On physical examination, the nurse charted Debra D.'s abdomen was "Epigastric, Tender [Left], Normal Bowel Sounds, Tender [Right], Soft And Tender Upper." (AR at p. 494).  Saline and intravenous **Morphine** were administered.  Id. During this session, the nursing staff noted Debra D. was "passing flatus and stool."  Id.  Dr. Patrick T.'s discharge impressions were:

1. acute upper abdominal pain[;]
2. chronic upper abdominal pain[;]
3. chronic short gut syndrome[;]
4. multiple abdominal surgeries[; and]
5. chronic diarrhea.

Id. at p. 495.

On July 24, 2014, Debra D. was seen by Dr. Charles B. at the Regional Health Physicians Clinic. (Docket 11 ¶ 41; <u>see also</u> AR at p. 506). On physical examination, the doctor charted her abdomen was "distended and epigastric tenderness and soft. Bowel sounds/auscultation; normal." (AR at p. 509) (bold and capitalization omitted). The doctor charted her mood, affect, judgment, memory, and speech as normal and she was cooperative. (Docket 11 ¶ 41). Dr. Charles B. recommended she follow up with Dr. Richard K. on an as needed basis. (AR at p. 509).

On August 12, 2014, Debra D. met with Holly T. (Docket 11 ¶ 71). Debra D. appeared anxious and indicated being pretty stressed at work. <u>Id.</u> She reported her work supervisor was not very supportive when Debra D. had to go home because of illness. <u>Id.</u> Holly T. charted:

> [Debra D.] has not had the energy or desire to do anything. Processed struggles with work and not feeling well. Anxiety seems to be constant along with depression and not feeling like she wants to do anything.

<u>Id.</u>; <u>see also</u> AR at p. 526.

On September 17, 2014, Debra D. was seen at the Sturgis Regional Hospital emergency room. (Docket 11 ¶ 42; <u>see also</u> AR at pp. 627-33). Her complaints were generalized abdominal pain which had been increasing since early morning, with diarrhea the day before. <u>Id.</u> at p. 627. The physical examination charted her abdomen as distended, tender and with hyperactive bowel. <u>Id.</u> at p. 629. The nursing staff charted that Debra D. was crying and

she was under moderate severe distress.   Id.   **Fentanyl**[12] was administered

which reduced her pain.   Id. at p. 632.   Upon discharge, Debra D. was given

**Hydrocodone** to assist her in continuing to reduce pain.   Id.

The next day, Debra D. saw Dr. Richard K.   (Docket 11 ¶ 43).   During

his physical examination the doctor charted her abdomen was normal, except

for "very minimal tenderness of the upper abdomen."   (AR at p. 566)

(capitalization and bold omitted).   The doctor's assessment included

"depressive disorder" and "short bowel syndrome."   Id. (capitalization and bold

omitted).

On **September 25, 2014**, Debra D. was seen by Dr. Richard K.   (AR at

pp. 568-70.   Upon physical examination, the doctor charted her abdomen was

normal, except for "mild diffuse tenderness."   Id. at p. 568 (bold omitted).

During the discussion with his patient, Dr. Richard K. charted "[f]or her short

bowel syndrome and chronic intermittent abdominal pain, we are going to try

her on some narcotics[13] for this.   She is fully aware that this is not a long-

term treatment plan, but if we can do it where every other month she needs a

day or two of narcotics to try and keep her out of the emergency room it is

certainly appropriate."   Id.   He encouraged her to seek "a higher level of care,

---

[12]"Fentanyl is an opioid medication . . . used to prevent pain . . . ."
https://www.drugs.com/search.php?searchterm=fentanyl.

[13]Debra D. was prescribed **Hydrocodone with Acetaminophen**.   (AR at
p. 568).

22

i.e. Mayo Clinic, etc. for further evaluation of her short bowel syndrome and her chronic abdominal pain." Id.

On **October 6, 2014**, Debra D. saw Dr. Richard K. for continuing complaints of abdominal pain and nausea. (Docket 11 ¶ 44). She reported an acute abdominal episode which had been going on for the past day and one-half. Id. Debra D. reported using **Bentyl** but without success. Id. Because of her condition, Debra D. said she had been unable to sleep the night before and had to take yesterday off from work. Id. Again, Dr. Richard K. encouraged her to been seen at the Mayo Clinic. Id.

On **December 13, 2014**, Debra D. was seen at the Sturgis Regional Hospital emergency room. Id. ¶ 46; see also AR at p. 637. She reported severe abdominal pain with diarrhea all day. Id. The chart noted Debra D. was anxious and experiencing severe distress. (AR at p. 639). Because of her condition, the nursing staff was unable to obtain IV access. Id. at p. 642. **Fentanyl** was injected intramuscularly and she was given **Bentyl** orally. Id. After Debra D. was stabilized, she was discharged. Id.

On the late afternoon of December 17, 2014, Debra D. went to the Rapid City Regional Hospital emergency room. (Docket 11 ¶ 47). She complained of abdominal pain starting two days earlier. (AR at pp. 650 & 657). Although her abdomen appeared normal, an abdominal CT scan disclosed "finding consistent with diarrhea." Id. at pp. 651-52. She was admitted to the hospital "for further IV fluids, pain medications and bowel rest." Id. at p. 652.

23

Emergency room physician Dr. John H. noted the following clinical impressions:

1.      abdominal pain[;]
2.      acute pancreatitis[;]
3.      dehydration[;]
4.      metabolic acidosis[; and]
5.      hypokalemia[.]

Id.

Upon admission to the hospital on December 17, the nursing staff charted her condition with "abdominal pain for three days, recurrent, no acute abdomen, abdominal/pelvic CT with no evidence of acute abdomen or small bowel obstruction[;] diarrhea—chronic[;] mild pancreatitis[;] hypokalemia—metabolic acidosis[;] status post multiple abdominal surgeries including small bowel resection partial." Id. at p. 659 (capitalization and numbering omitted). The attending physician, Dr. Margaret D., prescribed **Hydrocodone with Acetaminophen**, **Bentyl**, and a number of over-the-counter medications at discharge on December 20, 2014. Id. at p. 662.

<u>2015</u>

On January 6, 2015, Debra D. saw Dr. Richard K. (Docket 11 ¶ 49). Her complaint was another "episode of . . . abdominal pain." (AR at p. 584). She reported that since being released from the hospital she had good days and bad days with intermittent abdominal discomfort. (Docket 11 ¶ 49). The doctor noted in the history and physical section of her chart that "[s]he always has diarrhea due to her chronic bowel syndrome. . . . The diarrhea really does

not change much from her baseline. These all appear to be intermittent in nature and she has found no triggering factor." (AR at p. 584). The doctor's physical examination showed a normal abdomen, except for "epigastric tenderness, [left lower quadrant] tenderness and [right lower quadrant] tenderness." Id. at p. 587 (bold omitted). The doctor charted that "today . . . she appears to be in more pain and discomfort." Id. at p. 588. Because of her condition, Dr. Richard K. ordered "a 24-hour urine for 5-HIA serotonin, do a gastrin level and tryplase."[14] Id.

On April 6, 2015, Dr. Richard K. directed Debra D. to go to the Sturgis Regional Hospital emergency room. (Docket 11 ¶ 50). Her chart noted she was "crying, in obvious distress." (AR at p. 793). Upon examination, her abdomen was charted as "[s]oft. She is mildly uncomfortable to palpation in all quadrants. There is no guarding, no rebound. Her bowel sounds are positive." Id. Dr. Michael H. prescribed **Fentanyl** and **Bentyl**. Id. at p. 794. She was "discharged in stable condition." Id.

On April 13, 2015, Debra D. returned to the Sturgis Regional Hospital emergency room. (Docket 11 ¶ 51; see also AR at p. 804). She presented with abdominal pain and diarrhea. (Docket 11 ¶ 51). An abdominal CT disclosed her colon was moderately distended. Id. She was given IV fluids, **Morphine**,

---

[14]Tryplase (Pancreatin) "is a combination of digestive enzymes (proteins). These enzymes . . . are important for digesting fats, proteins, and sugars." https://www.drugs.com/search.php?searchterm=pancreatin.

**Zofran**,[15] and **Fentanyl**.   Id.; see also AR at p. 804.   The emergency room physician directed she be admitted to the Rapid City Regional Hospital.   Id. Debra D. was driven to the Rapid City Regional Hospital by her granddaughter. (Docket 11 ¶ 51).

At the Rapid City Regional Hospital, Debra D. was seen by Dr. Richard K. (AR at p. 678).   The physical examination charted a mildly diffused abdomen. (Docket 11 ¶ 52).   An abdominal CT disclosed considerable gas in the colon. Id.   Debra D. was admitted for pain control and prescribed **Norco**,[16] **Zofran** and IV fluids.   Id.; see also AR at p. 685.   A colonoscopy was performed. (Docket 11 ¶ 53).   The clinical impression was "moderate colonic spasm."   Id. Debra D. remained in the hospital for three days and was discharged on April 17, 2015.   Id.

On April 24, 2015, Debra D. had a follow-up appointment at the Spearfish clinic.   Id. ¶ 54; see also AR at p. 887.   Dr. Richard K. charted she appeared to be doing well, except his psychiatric examination noted she had poor insight.   (Docket 11 ¶ 54).   His clinical assessment included abdominal pain, unspecified site, irritable bowel syndrome, anxiety state, unspecified, depressive disorder, not elsewhere classified, and short bowel syndrome.   Id.

---

[15]"Zofran is used to prevent nausea and vomiting . . . ." www.drugs.com/search.php?searchterm=zofran.

[16]Norco is a combination of hydrocodone and acetaminophen "used to relieve moderate to moderately severe pain."   www.drugs.com/norco.html.

Dr. Richard K. concluded her irritable bowel syndrome and short bowel syndrome probably flared up because of stress.   Id.; see also AR at p. 892. While Debra D. was requesting she be released from work for two months, the doctor was not comfortable releasing her for that extended period.   Id. However, Dr. Richard K. was not opposed to her counselor making that type of recommendation if appropriate.   Id.

On April 29, 2015, on CSS's letterhead, Debra D.'s new therapist, Cathy L., wrote a "To Whom It May Concern" letter.   Id. ¶ 72.   The letter contained the following:

> This letter is in regards to my client, Debra [D.].   I have been seeing Debra for outpatient mental health therapy since February 2015. She saw a different therapist from CSS since October 2013.   Debra has been diagnosed with short bowel syndrome by her medical doctors, which produces pain on a nearly daily basis, and she experiences frequent diarrhea.   It is common that stress can exacerbate physical illness, and Debra has noticed that her symptom severity increases when stress increases.   For this reason, I recommend that Debra take a 2 month leave of absence from her work at Northern Hills Training Center in order to allow her symptoms to subside and for her body to heal.   This will also allow her time for her mind to relax as well, and with mind-body connection, perhaps she would be able to return to work in much better overall health.

Id.; see also AR at p. 703.[17]

---

[17]The parties identify this therapist as "Kathy," but the record identifies her as "Cathy."   (AR at p. 703).   Cathy L. has a Masters in Social Work ("MS"), is a licensed professional counselor in mental health ("LPC-MH"), a QMHP, an ACT [unknown acronym] and is an outpatient therapist and clinical supervisor at CSS.   (Docket 11 ¶ 72; see also AR at p. 703).

Debra D. met with Cathy L. on May 28, 2015. (Docket 11 ¶ 73). Other than being sick the first week of being off from work, Debra D. felt she was feeling great physically and mentally and happy like she used to feel. Id. She was still working in her trolley job two days a week and was considering adding more shifts in the summer, but wanted to wait and see how things were going. They discussed her suicide risk factors, protective factors and formulated a suicide prevention plan. Id. Debra D. reported having been recently prescribed Cymbalta for depression and Hydrocodone for pain. Cathy L. reported her patient's condition greatly improved since initiating treatment. Id. Scheduling of the next session was left up to Debra D. (AR at p. 771).

On July 2, 2015, Debra D. went to the Sturgis Regional Hospital emergency room. Id. ¶ 55; see also AR at p. 845. Her complaint was chronic recurring abdominal pain. (Docket 11 ¶ 55). The physical examination charted a diffusely, mildly uncomfortable abdomen. Id. An x-ray disclosed a fairly large stool in her colon, despite Debra D.'s explanation that she had three bowel movements the previous day. Id. Debra D. was given **Fentanyl** and **Bentyl** which reduced but did not resolve her pain. (AR at p. 46). Dr. Michael H. recommended a stool softener and prescribed **Hyoscyamine**[18] and instructed Debra D. to use it when she felt pain coming on. Id.

---

[18]Hyoscyamine is used to treat stomach and bowel problems. (Docket 11 ¶ 55) (referencing www.drugs.com/cdi/hyoscyamine.html).

On August 27, 2015, Debra D. was seen at the Rapid City Regional Medical Clinic.   Id.¶ 56; see also AR at p. 915.   Debra D. was concerned about a possible kidney infection.   (Docket 11 ¶ 56).   The urinary analysis was negative, but she did have ureterolithiasis.[19]   Id.; see also AR at p. 915. Debra D. was given **Toradol**[20] and her pain diminished.   (AR at p. 919).

On October 14, 2015, Debra D. presented at the Rapid City Regional Hospital emergency room with complaints of severe pain which began 36 hours earlier.   (Docket 11 ¶ 57).   She complained of nausea and diarrhea and described her pain as severe.   Id.   All laboratory tests and a CT were negative. Id.   Dr. Brook E.'s clinical impressions were:

1. acute nonspecific diffuse abdominal pain[;]
2. short gut syndrome[;]
3. history of pancreatitis[;]
4. history of small bowel obstruction[;]
5. nausea[; and]
6. diarrheal illness[.]

(AR at pp. 932-33).   "After [the administration of] fluids and pain medications, . . ." Debra D. was "discharged with continue symptomatic treatment and outpatient followup [sic]."   Id. at p. 932.

---

[19]Ureterolithiasis indicates the presence of calculus, kidney stones, in the ureters.   https://medical-dictionary.thefreedictionary.com/ureterolithiasis.

[20]"Toradol . . . is a nonsteroidal anti-inflammatory drug . . . . [And] is used short-term (5 days or less) to treat moderate to severe pain." https://www.drugs.com/toradol.html.

On **October 28, 2015**, Debra D. was seen at the Rapid City Regional

Hospital emergency room.   (Docket 11 ¶ 58).   It was reported that while at her

daughter's home, Debra D. became confused and had slurred speech.   Id.

She was found on the bathroom floor completely confused and globally weak.

Id.   This episode was not observed by any family member.   Id.   In the

emergency room, her physical examination showed normal bowel sounds,

diffusely tender abdomen with no rebound or guarding and her back was

nontender.   Id.   Her gait upon presentation was normal.   Id.   A head CT was

negative and an abdominal CT disclosed a moderate amount of stool

throughout her colon, suggestive of constipation, but nothing acute.   Id.

Debra D. was admitted to the hospital for further treatment and

observation.   Id. ¶ 59.   Upon admission, her assessment included acute

altered mental status, acute severe dehydration, acute constipation, chronic

reactive airway disease, chronic coronary artery disease, chronic short bowel

syndrome and chronic depression.   Id.; see also AR at pp. 946-47.

Intravenous fluids were administered and Debra D. felt better.   (AR at p. 956).

With a history of hypoglycemic events, she and the physician discussed

strategies to prevent a reoccurrence.   Id.

Against this complete medical history, the ALJ disingenuously concludes

the medical records do not support the severity of Debra D.'s complaints:

> [S]he was working part-time, crocheted, read, watched television,
> and helped care for her daughter.   Despite the claimant's
> symptoms, the claimant reported that she worked regularly, helped

run errands, had few problems maintaining personal care, did not need special reminders to take medication, prepared simple meals, did laundry, washed dishes, ironed clothes, could go out alone, drove a car, shopped in stores, talked with friends on the computer, went to church, and had no problems following instructions.

Id. at pp. 21-22.

Debra D. described in detail the consequences of her fecal incontinence. (Docket 11 ¶ V(A)(130)). She wears adult briefs and pads, elastic pants or skirts and slip on shoes so she can get to a bathroom quickly, hoping not to have an accident. Id. ¶¶ 143 & 164. There are times when fecal matter comes out of the legs and out the back of her Depends pad because she excretes so much fecal matter at one time. Id. ¶ 164. She carries a bag with extra underwear, shorts and an air freshener. Id. ¶ 146.

Because her fecal incontinence worsened in 2014, Debra D. and her supervisor at the Northern Hills Training Center agreed to reduce her from five shifts to two shifts per week. Id. ¶ 130. Her absences from work continued at a couple days a month, about every three months, and sometimes she would be gone for a week at a time during hospitalizations. Id. These absences would cause problems at work because Debra D.'s co-workers were covering for her and there was a lot of work she could not do. Id. ¶ 131-32. At the Center there were three bathrooms which made it easier for Debra D. to get to a bathroom on short notice. Id. ¶ 140. If she had an episode of fecal incontinence, Debra D. would take a quick shower and change clothes. Id.

¶ 141.   Even with significant accommodations, Debra D. was not able to continue working at the Center.   Id. ¶ 133.

During this same period, Debra D. was driving a trolley for the City of Deadwood, South Dakota, working two four-hour shifts a week.   Id. ¶ 136. Debra D. testified that at every trolley stop she would need to go into the casinos and use the bathrooms.   Id. ¶ 137.   Even then, sometimes she would not make it to the bathroom in time, so she began carrying a change of clothes. Id.

Contrary to the ALJ's ruling, the objective medical records support a definitive conclusion that Debra D. suffered intermittent, chronic abdominal bowel distress and pain, resulting in diarrhea and uncontrollable fecal incontinence.   In this record, there is no suggestion that Debra D. is a malinger or drug-seeker, but rather an individual observed by not just one but many qualified physicians and medical care providers to be in chronic, severe pain.   Her pain frequently required narcotic medications such as Morphine, Fentanyl, Narco, Hydrocodone, Hydrocodone with Acetaminophen and a nonsteroidal anti-inflammatory drug, Toradol, as well as Bentyl, Perphenazine-Amitriptyline, Zofran and Hyoscyamine to address her physical conditions and Cymbalta or Wellbutrin to combat her resulting stress and depression.   With these diagnoses and based on the medical records identified above, the objective medical evidence supports the level of severity asserted by Debra D.

The ALJ's declaration that "the objective medical records do not *completely* corroborate her statements and allegations regarding her impairments and resultant limitations" sets too high a bar. (AR at p. 18) (emphasis added). There not need be complete corroboration between a claimant's medical records and her testimony. "The ALJ may not disregard subjective evidence concerning pain merely because it was not fully corroborated by the objective evidence." Smith v. Schweiker, 728 F.2d 1158, 1163 (8th Cir. 1984).

The ALJ gave "no significant weight" to either of Debra D.'s therapists because they are "not an acceptable medical source under . . . . 20 C.F.R. § 404.1513." (AR at p. 22). The ALJ states Holly T. "does not set out how the claimant's condition, physical or mental, specifically impacts the claimant's functionality or ability to work, such as indicating that the claimant could only understand simple instructions. . . . [And Cathy L.] is not qualified to assess ramifications of alleged mental impairments on a physical condition or to opine on the cause or duration of a physical impairment." Id.

Social Security Ruling ("SSR") 06-03p instructs an ALJ when considering the opinions and evidence from sources which are not acceptable medical sources. This category of medical source witnesses includes "nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists . . . ." SSR 06-03p, 2006 WL 2263437 (August 9, 2006). Within this ruling, non-medical source

witnesses include "siblings, other relatives, friends, neighbors, clergy, and employers." Id. "[I]nformation from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id.

The ALJ missed the point of the therapists' records. While they may not have articulated the concerns focused on by the ALJ, the therapists provide significant evidence supporting Debra D.'s credibility. Both therapists considered Debra D.'s depression an element intertwined with her short bowel syndrome and fecal incontinence. Their concern for her chronic condition provides support to, and does not detract from, Debra D.'s subjective complaints of pain. With their specialized education and knowledge of Debra D.'s condition, Holly T. and Cathy L. provide "insight into the severity of" Debra D.'s impairments and how they "affect[] [her] ability to function." Id.

The same holds true for the statements of Darcy B., Kathy W., Kym S. and Vicki O. The ALJ gave only lip service to SSR 16.03p by assigning little weight to these statements "because of its [sic] high degree of subjectivity, and its [sic] lack of medically acceptable standards." (AR at p. 22).

A review of these statements discloses they are not highly subjective, but articulate events and actions which objectively support Debra D.'s testimony that pain and fecal incontinence significantly impair her ability to work an 8-to-5 job. These third-party statements also provide character support to Debra D.'s credibility.

Co-worker Darcy B. submitted a four-page statement about her relationship with Debra D. (Docket 11 ¶ III(C)(10-21)). Darcy B. was a senior staff member of the Northern Hills Training Center. Id. ¶ 11. Darcy B. and Debra D. were charged with assisting eight mentally disabled and physically handicapped residents. Id. They assisted with morning routines, showers, medications distribution, and two meals per shift. Id. In addition, they did cleaning, vacuuming, shampooing carpets, laundry and other household tasks. Id. ¶ 12. Darcy B. stated Debra D. was open and honest about her health conditions. Id. ¶ 13. In the beginning, her condition was not significant because Debra D. only needed to make a few random trips to the bathroom throughout the day. Id. She confided in Darcy B. about always being in pain, but Darcy B. stated Debra D. always tried to keep working and do her fair share of the workload. Id. Darcy B. described Debra D. as always being an honest, hardworking individual who tried not to complain. Id. ¶ 15. As the months went by, things deteriorated and during the last three to four months when Darcy B. came to work she could tell Debra D. had been crying. Id. ¶ 16. Darcy B. reported although Debra D. tried to stay and work, she was not physically able to do the things required during their daily routine. Id. Debra D.'s pain increased as did her trips to the bathroom. Id. ¶ 17. Debra D. never asked for any special treatment and always tried to do her best at her job. Id. ¶ 18. Darcy B.'s workload steadily increased because of Debra D.'s

inability to work and to compensate for her lack of energy, strength and constant, excruciating pain.   Id. ¶ 19.

Long-time friend Kym S. submitted a third-party statement.   (Docket 11 ¶ III(A)(1-3).   She has known Debra D. since 2006 and has always been aware of her medical conditions.   Id. ¶ 2.   Kym S. states:

> Every time we get together, we always have at least 2 days of her medical problems coming up.   She wakes up feeling not so good, followed by numerous trips to the bathroom, sometimes staying in there most of the day.   If she is in Sturgis, she changes clothes many times because of the inability to make it to the bathroom.   When she has visited me in Arizona, we have had to make trips to the clothing store to buy clothes, wipes, and incontinence products, etc. just to get thru the episode.   Also we have had to cancel many site seeing trips due to her unpreventable illness, as she is almost bed/couch [bound] until it passes.   We have had to even put her in the hospital usually overnight, so that they can help manage it. This has always been so bad and I have never figured out how she manages to work or hold a job.   It seems that over the passing years it has continued to get worse and/or more episodes. I truly believe that Deb [D.] is an individual who needs disability.

Id. ¶ 3.

Another long-time friend Kathy W. submitted a third-party statement. Id. ¶ III(B)(1-9).   She has been a friend of Debra D. since 1997.   Id. ¶ 1. Kathy W. considers herself a close friend and confidant.   Id. ¶ 2.   After Debra D. had her surgery, she began to have problems with her bowels.   Their weekly meetings diminished and ultimately stopped because of her embarrassment. Id. ¶ 4.   Kathy W. and Debra D. still met once a week at her house, Kathy W.'s house or at a restaurant.   Debra D. excused herself frequently to use the bathroom.   Id. ¶ 5.   Kathy W. reported that Debra D. canceled many events at

the last minute, including special occasions, due to pain or blockage caused by her short bowel syndrome.  Id.  Debra D. also turns down invitations by Kathy W. to accompany her on trips because of the problems associated with her condition.  Id. ¶ 9.

Debra D.'s daughter, Vicki O., submitted a third-party statement.  Id. ¶¶ III(D)(1-8).  She observed her mother must go to the restroom on a moment's notice and her stamina is almost non-existent.  Id. ¶ 2.  Her mother is constantly getting up during the night to go to the bathroom and she does not sleep well.  Id. ¶ 5.  Sometimes her mother is in such pain that Vicki O. must remind her take her medications.  Id.

Vicki O. states her mother does not do much with her grandchildren because she is in pain and everything takes too long.  Id. ¶ 7.  Her mother used to do a lot of sewing, crocheting and reading, but now just watches television and lies in bed.  Id.  She goes to church regularly, visits on the telephone and spends some time on the computer.  Id.

Vicki O. observes her mother has a hard time completing tasks because she must stop to use the bathroom.  Id. ¶ 8.  Her mother is now confrontational and grouchy with others and avoids anyone who is not family. Id.  Debra D. has a hard time with concentration, sometimes has a hard time understanding, must have things repeated and does not handle stress well. Id.

If these relationships were a valid basis for rejecting their testimony, the regulations would specifically direct an ALJ to disregard the statements and observations of these individuals. "To the contrary, the regulations encourage an ALJ to seek the testimony of family members [and others] because they have the most frequent contact and exposure to the claimant's physical and mental impairments. . . . Consideration of third party statements must be considered when an ALJ is evaluating a claimant's pain." Dillon v. Colvin, 210 F. Supp. 3d 1198, 1207 (D.S.D. 2016) (citing 20 CFR §§ 404.1512(b)(1)(iii), 404.1513(d)(4) and § 404.1529(a); see also SSR 16.03p).

The failure of the ALJ to give due consideration to the testimony of these witnesses is contrary to the regulations. 20 CFR §§ 404.512(b)(1)(iii), 404.1513(d)(4), and 404.1529(a). The ALJ's conclusion to give this testimony little or no weight is not supported by substantial evidence and the ALJ did not provide good reasons for discounting this testimony. Id.

The court concludes there are no inconsistencies in the record that justify finding Debra D. not credible. The evidence supporting Debra D.'s credibility "fairly detracts from [the Commissioner's] decision." Reed, 399 F.3d at 920 (quoting Haley, 258 F.3d at 747); Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994). When examined in detail, the records support rather than contradict the testimony of Debra D. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Guilliams, 393 F.3d at 801-02.

2.    IS THE RFC SUPPORTED BY SUBSTANTIAL
      EVIDENCE?

The ALJ found Debra D. retained the RFC to perform light work.   (AR at

p. 16).   In support of this conclusion, the ALJ relied on the opinions of two

state agency medical consultants.

> These opinions are based on a thorough review of the available
> medication records and a comprehensive understanding of agency
> rules and regulations.   The undersigned finds these opinions are
> internally consistent and well supported by a reasonable
> explanation and the available [record]. As such, the undersigned
> affords these opinions significant weight.

Id. at p. 23.

Plaintiff objects to this finding, asserting "[t]he ALJ's RFC does not

include Plaintiff's need to take extra breaks to use the bathroom and does not

recognize her need to reduce stress and her expected absences due to

necessary emergency room visits and hospitalizations."   (Docket 14 at p. 21).

She argues "[a]ll of which are supported by the overwhelming consistent

evidence from her doctors, her testimony and third party observations.

Accordingly, the ALJ's RFC is not supported by substantial evidence in this

record."   Id.

The Commissioner counters plaintiff's argument contending that "while

Plaintiff subjectively reported needing extra bathroom breaks, she has not

pointed to any objective evidence supporting this allegation."   (Docket 15 at

p. 7).   The Commissioner submits plaintiff's allegations are not supported

because "her treatment providers did not impose any restrictions or indicate

39

the need for job accommodations in their treatment notes." Id. For that

reason, the Commissioner concludes "Plaintiff failed to prove additional

limitations beyond those the ALJ accounted for in . . . [the] RFC finding." Id.

at p. 8.

> In her reply brief plaintiff argues:

> There is no question in this record that Plaintiff suffers from chronic, unpredictable diarrhea. It's repeatedly noted throughout her medical records and supported by objective medical evidence . . . . In addition to the overwhelming objective medical evidence supporting the fact she has chronic unpredictable diarrhea, Plaintiff's co-worker's and friend's statements support her 'subjective' need to use the restroom.

(Docket 16 at pp. 2-3). Plaintiff submits "[a]ll of this evidence overwhelming[ly]

supports Plaintiff's need for extra bathroom breaks. None of it was properly

considered by the ALJ in her credibility analysis or her RFC with respect to

need for extra breaks." Id. at p. 3.

The ALJ's reliance on the two state agency consultants is misplaced.

Neither one of them mentioned the decisions of Debra D.'s treating physicians

to administer prescription drugs for her pain and the fact that even then her

severe abdominal pain and chronic diarrhea never fully disappeared. See AR

at pp. 76-86 & 88-100. It is apparent from the record that these consultants'

opinions were not based on a thorough recognition of the record. Opinions

without consideration of these records "fairly detracts from [the] decision" of

the ALJ to adopt their opinions. Reed, 399 F.3d at 920. The ALJ erred, both

factually and as a matter of law, by choosing to give substantial weight to the

opinions of the consulting physicians.    20 CFR § 404.1527(c)(2); Choate,

457 F.3d at 869; House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007); Dolph v.

Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2002).    The Commissioner's findings

on this issue are not supported by the substantial evidence in the records as a

whole.    42 U.S.C. § 405(g); Choate, 457 F.3d at 869.

"It [is] the ALJ's responsibility to determine [a claimant's] RFC based on

all the relevant evidence, including medical records, observations of treating

physicians *and others, and [the claimant's] own description of [her] limitations.*"

Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (emphasis added) (citing

20 CFR §§ 404.1545-46).    The decision of the ALJ to discount Debra D.'s

description of her physical limitations and their impact on her activities of daily

living affect the step four analysis in establishing a RFC.    In addition, the

refusal of the ALJ to consider Vicki O.'s description of her mother's activities of

daily living impact the step four analysis of establishing RFC for Debra D.

The court finds the Commissioner's argument is without merit.    The

court already concluded the ALJ's credibility determination was not supported

by substantial evidence and that Debra D. was credible.    The conditions

experienced by Debra D. are conditions commonly expected to wax and wane.

It is not unexpected for an individual with these conditions to appear and act

healthy, while at other times to suffer from the extreme, debilitating problems

these physical and mental conditions cause.    See Nowling v. Colvin, 813 F.3d

1110, 1123 (8th Cir. 2016) ("the ALJ improperly accorded great weight to

41

[those] statements . . . indicating that Nowling demonstrated 'improvement' without acknowledging that Nowling's symptoms waxed and waned throughout the substantial period of treatment [and] without acknowledging the unpredictable and sporadic nature of Nowling's symptoms . . . .").

The ALJ's RFC fails to properly consider plaintiff's fecal incontinence and the intermittent and unanticipated resulting chronic diarrhea. This deficiency in the ALJ's analysis "fairly detracts from [the Commissioner's] decision." Reed, 399 F.3d at 920 (quoting Haley, 258 F.3d at 747); Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994).

This error is compounded. The ALJ found Debra D. was "capable of performing past relevant work as a teacher's aide II, trolley driver, and resident care aide. This work does not require the performance of work-related activities precluded by the claimant's [RFC]." (AR at p. 23) (bold omitted). The failure of the ALJ to acknowledge Debra D. could only work part-time as a trolley driver and the failure to include Debra D.'s fecal incontinence in the analysis of whether she was capable of performing these past positions of employment "fairly detracts from [the Commissioner's] decision." Reed, 399 F.3d at 920 (quoting Haley, 258 F.3d at 747); Morse, 32 F.3d at 1229. Debra D. satisfied the burden of persuasion to demonstrate her RFC must include a proviso that she be allowed every day to take frequent, unanticipated bathroom breaks often lasting ten minutes. Stormo, 377 F.3d at 806.

42

Remand to permit the ALJ to complete the step four analysis would normally be in order. But the error is further compounded at step five because the hypothetical questions posed by the ALJ failed to properly contain the limitations established in Debra D.'s RFC. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) ("The hypothetical question posed to the vocational expert must capture the concrete consequences of [the] claimant's deficiencies.") (internal quotation marks and citation omitted).

William Tisdale, the vocational expert called by the ALJ, testified that none of the jobs ultimately identified by the ALJ would accommodate unscheduled bathroom breaks on an unpredictable basis which could require at least ten minutes a session. (AR at p. 71). He also acknowledged none of the jobs would permit an employee to go home and take a shower, or shower at work and change clothes, on an unpredictable, unscheduled basis because of fecal incontinence. Id. at pp. 71-73. In other words, there are no jobs available to Debra D.

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 409(g). If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate." Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992). Remand to the Commissioner is neither necessary nor appropriate in this case. Debra D. is disabled and entitled

to benefits. Reversal is the appropriate remedy at this juncture. <u>Thompson</u>, <u>supra</u>.

## ORDER

Based on the above analysis, it is

ORDERED that plaintiff's motion (Docket 14) is granted and the decision of the Commissioner of April 6, 2016, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff Debra D.

Dated September 26, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE